**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *Plaintiff-Appellant/ Cross-Appellee*, v. CASHCALL, INC.; WS FUNDING, LLC; DELBERT SERVICES CORPORATION; J. PAUL REDDAM, *Defendants-Appellees/ Cross-Appellants.* | Nos. 18-55407 18-55479 D.C. No. 2:15-cv-07522- JFW-RAO OPINION |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted September 9, 2019
Submission Withdrawn October 21, 2019
Argued and Resubmitted September 23, 2021
Pasadena, California

Filed May 23, 2022

Before: John B. Owens, Ryan D. Nelson, and
Eric D. Miller, Circuit Judges.

Opinion by Judge Miller

# SUMMARY[*]

### Consumer Financial Protection Act / Consumer Financial Protection Bureau

The panel affirmed the district court's judgment finding CashCall, Inc., its CEO, and several affiliated companies liable for a deceptive loan scheme; and vacated the district court's order imposing a civil penalty of $10.3 million and declining to order restitution.

CashCall made unsecured, high-interest loans to consumers throughout the country, and sought to avoid state usury and licensing laws by using an entity operating on an Indian reservation. The entity issued loan agreements that contained a choice-of-law provision calling for the application of tribal law. The Consumer Financial Protection Bureau brought this action alleging that the scheme was an "unfair, deceptive, or abusive act or abusive practice." 12 U.S.C. § 5536(a)(1)(B). The district court held that CashCall violated the Consumer Financial Protection Act ("CFPA").

The panel first considered whether the Bureau lacked authority to bring this action because it was unconstitutionally structured. The panel held that pursuant to *Collins v. Yellen*, 141 S. Ct. 1761 (2021), despite the unconstitutional limitation on the President's authority to remove the Bureau's Director, the Director's actions were valid when they were taken. Both the complaint and the notice of appeal were filed while the Bureau was headed by

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a lawfully appointed Director, Richard Cordray. The panel declined to consider CashCall's new theory, offered months after oral argument, that the Bureau's structure violated the Appropriations Clause of the Constitution.

The panel next considered CashCall's argument that the loans were valid because they were subject to tribal law, not state law. The loans were valid under the law of the Cheyenne River Sioux Tribe. CashCall did not dispute that the loans were invalid under the laws of the States in which the customers resided. The panel applied federal common law choice-of-law principles. The panel held that the Tribe had no substantial relationship to the transactions, and because there was no other reasonable basis for the parties' choice of tribal law, the district court correctly declined to give effect to the choice-of-law provision in the loan agreements. For the States at issue in this case, application of the state law meant the loans were invalid.

CashCall also argued that CFPA liability for a deceptive practice could not be predicated on a violation of state law. The panel held that CashCall's argument found no support in the text of the CFPA. CashCall led borrowers to believe that they had an obligation to pay, when in fact under their States' laws they did not. That is the deceptive act pursued by the Bureau, and it fell within the prohibition of the statute.

The panel next considered the Bureau's argument that the district court should have imposed a tier-two civil penalty, which requires a finding that CashCall acted recklessly, rather than a tier-one penalty, which does not. The district court determined that CashCall did not act recklessly. The panel held that this was not clearly erroneous – but only as it applied to the early stages of CashCall's scheme. From September 2013, CashCall's

conduct was reckless. The panel concluded that from September 2013, the danger that CashCall's conduct violated the CFPA was so obvious that CashCall must have been aware of it. The district court's contrary conclusion was clearly erroneous. The panel vacated the civil penalty and remanded with instructions that the district court reassess it, with the penalty for the period beginning in September 2013 being based on tier two.

CashCall's CEO Paul Reddam argued that the district court erred in finding him personally liable. The panel held that Reddam's liability turned on whether he had the requisite knowledge or acted recklessly. The panel rejected Reddam's argument that he lacked the necessary mental state because he relied on the advice of counsel. The panel held that continuing to collect loans after September 2013 was reckless, and the district court did not err in holding Reddam personally liable.

The Bureau argued that the district court erred in denying restitution. Agreeing with the Bureau that the district court's decision rested on a legal error, the panel vacated the order denying restitution and remanded for further proceedings. The panel left it to the district court to determine whether restitution was appropriate in this case, and if so, in what amount. The panel noted that any restitution award must be consistent with the CFPA, and whether consumers received the benefit of their bargain was not relevant.

**COUNSEL**

Kristin Bateman (argued) and Kevin E. Friedl, Senior Counsel; Steven Y. Bressler, Assistant General Counsel; John R. Coleman, Deputy General Counsel; Mary McLeod, General Counsel; Bureau of Consumer Financial Protection, Washington, D.C.; for Plaintiff-Appellant/Cross-Appellee.

Reuben Camper Cahn (argued), Reuben C. Cahn, and Gregory M. Sergi, Keller/Anderle LLP, Irvine, California; Allen L. Lanstra Jr. (argued), Caroline W. Van Ness, and Kasonni M. Scales, Skadden Arps Slate Meagher & Flom LLP, Los Angeles, California; Thomas J. Nolan, Pearson Simon Warshaw LLP, Sherman Oaks, California; for Defendants-Appellees/Cross-Appellants.

Robert M. Loeb and Analea J. Patterson, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; Christopher J. Cariello and Ned Hirschfeld, Orrick Herrington & Sutcliffe LLP, New York, New York; for Amicus Curiae Innovative Lending Platform.

## OPINION

MILLER, Circuit Judge:

CashCall, Inc., made unsecured, high-interest loans to consumers throughout the country. After attracting unwanted attention from regulators, it sought to avoid state usury and licensing laws by using an entity operating on an Indian reservation. CashCall paid for that entity to issue loans and then purchased the loans days later. The loan agreements contained a choice-of-law provision calling for the application of tribal law, so they would not be subject to the law of borrowers' home States, which would have prohibited the loans. CashCall sought advice from a scholar of federal Indian law, who opined that the scheme "should work but likely won't."

His concern proved well founded. The Consumer Financial Protection Bureau brought this action against CashCall, its CEO, and several affiliated companies, alleging that the scheme was an "unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a)(1)(B), because CashCall demanded payment from consumers under the pretense that the loans were legally enforceable obligations, when in fact they were invalid under state law. The district court found the defendants liable and imposed a civil penalty of $10.3 million, but the court declined to order restitution.

The Bureau appeals, arguing that the civil penalty should have been larger and that the district court should have ordered restitution. CashCall cross-appeals the finding of liability. We conclude that the district court correctly found liability but erred in assessing the penalty and in evaluating whether to grant restitution. We therefore affirm in part, vacate in part, and remand for further proceedings.

I

CashCall, Inc., is a California corporation that makes high-interest consumer loans. Until 2006, California was its primary market. CashCall sought to expand beyond California, but it was concerned that complying with usury laws in other States would make its operations unprofitable. It decided to pay two federally insured state-chartered banks to make loans, which it then purchased and serviced. Under federal law, those banks were exempt from out-of-state usury limits. *See* 12 U.S.C. § 1831d(a) (permitting a federally insured state-chartered bank to charge interest "at the rate allowed by the laws of the State . . . where the bank is located").

The arrangement drew regulatory scrutiny. In 2009, Maryland authorities ordered CashCall to pay a civil penalty of $5.6 million for what they characterized as a "rent-a-bank" scheme, in which "a payday lender partners with a federally insured bank to take advantage of the bank's exemption from state usury caps." *CashCall, Inc. v. Maryland Comm'r of Fin. Regul.*, 139 A.3d 990, 995–96 & n.12 (Md. 2016). West Virginia also imposed a large civil penalty. *CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300, at *1 (W. Va. May 30, 2014). Under pressure from the Federal Deposit Insurance Corporation, the state-chartered banks ceased their partnerships with CashCall. CashCall's last purchase of a loan from a bank was in November 2008.

CashCall then decided to pursue a similar arrangement with a lender operating under the laws of an Indian tribe. In 2009, a member of the Cheyenne River Sioux Tribe formed Western Sky Financial, LLC, as a South Dakota limited liability company with its offices located on the Cheyenne River Sioux Reservation. CashCall and Western Sky entered

into an assignment agreement and a service agreement. Under the assignment agreement, CashCall used a subsidiary, WS Funding, LLC, to set up an account with funds that Western Sky used to make loans. CashCall agreed to purchase all of the loans that Western Sky made; it did so just days after the loans were made, before the borrowers had made any payments. All economic benefits and risks then passed to CashCall, which also agreed to indemnify Western Sky for any expenses associated with legal or regulatory action. CashCall serviced the loans, together with Delbert Services Corporation, a company that CashCall created to collect on defaulted loans.

Western Sky offered loans of up to $10,000 at interest rates ranging from 89 to 169 percent. None of the borrowers resided on the Tribe's reservation. The borrowers did not apply for loans on tribal land; instead, they applied online or by telephone. At first, the calls were handled by CashCall loan agents in California, but eventually those duties transitioned to Western Sky loan agents on tribal land. Borrowers signed the loan agreement electronically on Western Sky's website, which was hosted by CashCall's servers in California. Borrowers made all payments from their home States.

Borrowers signed a loan agreement with Western Sky that identified Western Sky as the lender. The agreement contained a choice-of-law provision calling for the application of tribal law:

> This Agreement is governed by the Indian Commerce Provision of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. . . . Neither this Agreement nor Lender is subject to the

laws of any state of the United States of America.

By early 2011, several state authorities had initiated enforcement actions against CashCall or Western Sky. In September 2013, CashCall discontinued its purchase of Western Sky loans; without CashCall, Western Sky ceased its operations.

In December 2013, the Bureau brought this enforcement action against CashCall, WS Funding, and Delbert Services (collectively, "CashCall"). The complaint also named as a defendant J. Paul Reddam, CashCall's founder, CEO, and sole owner.

The Bureau alleged a violation of the Consumer Financial Protection Act (CFPA), which makes it unlawful for any "covered person"—defined as anyone who "engages in offering or providing a consumer financial product or service"—or any service provider "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. §§ 5481(6)(A), 5536(a)(1)(B). The complaint focused on 16 States (later narrowed to 13 States) in which CashCall, using Western Sky, made loans to consumers that were unlawful either because they had excessively high interest rates or because CashCall lacked a license to operate in the State. According to the complaint, CashCall engaged in deceptive acts by "represent[ing], expressly or impliedly, that the entire loan balance was owed . . . and that consumers were legally obligated to pay the full amount collected or demanded," when in fact "the loans, or some parts thereof, were void or not subject to a repayment obligation" under applicable state law.

The parties filed cross-motions for summary judgment, and the district court granted summary judgment to the

Bureau on liability. The court observed that the Bureau's theory of liability "rests entirely on its argument that the Court should disregard the tribal choice-of-law provision in the loan agreements, and apply the law of the borrowers' home states." The court agreed that state law governed. Although the loan agreements called for the application of tribal law, the court found that provision to be unenforceable because CashCall, not Western Sky, was the true lender and real party in interest to the loan agreements, so the Tribe did not have a substantial relationship to the parties or the transactions. The court also concluded that applying tribal law would violate the fundamental public policy of the States involved. After determining that the choice-of-law provision was unenforceable, the district court then concluded that the borrowers' home States had the most significant relationships to the parties and the transactions, so it applied the law of those States. And under state law, the court determined that "the Western Sky loans are void or uncollectible."

The district court concluded that CashCall "engaged in a deceptive practice . . . [b]y servicing and collecting on Western Sky loans, . . . [which] created the 'net impression' that the loans were enforceable and that borrowers were obligated to repay the loans in accordance with the terms of their loan agreements." That impression, the court explained, was "patently false." CashCall objected that the Bureau's enforcement action improperly federalized state-law violations by using them as the basis for identifying a violation of the CFPA. The district court rejected that argument, reasoning that "while Congress did not intend to turn every violation of state law into a violation of the CFPA, that does not mean that a violation of a state law can never be a violation of the CFPA."

The district court also determined that Reddam was individually liable for CashCall's violation of the CFPA. It found that he had "participated directly in and had the authority to control CashCall's . . . deceptive acts." In addition, it concluded that the undisputed facts demonstrated that "Reddam had the requisite factual knowledge to subject him to individual liability" and that, "[a]t the very least," he "was recklessly indifferent to the wrongdoing."

The district court then held a bench trial to determine the appropriate remedy. The CFPA provides for three tiers of civil penalties depending on a defendant's level of culpability. 12 U.S.C. § 5565(c)(2). A first-tier penalty requires no showing of scienter; a second-tier penalty applies to "any person that recklessly engages in a violation" of the CFPA; and a third-tier penalty applies to "any person that knowingly violates" the CFPA. *Id.* § 5565(c)(2)(A)–(C). The district court concluded that CashCall's violation was neither knowing nor reckless, so it imposed a first-tier civil penalty, which amounted to approximately $10.3 million.

The Bureau also sought a restitution award of approximately $235.6 million, reflecting the total interest and fees on the void loans. The district court declined to order restitution because, in its view, the Bureau "did not show that Defendants intended to defraud consumers or that consumers did not receive the benefit of their bargain from the Western Sky Loan Program." The court observed that the Bureau "did not present testimony from a single consumer that suggests that a borrower would not have entered into a loan transaction if they had known that CashCall—not Western Sky—was the true lender." The court also determined that even if restitution were warranted, the Bureau had not shown that the amount of restitution it sought was appropriate. Noting that the requested amount did not

account for expenses, the court concluded that it "would create a windfall for borrowers, including those who may not have made any payments on their loans."

## II

Before we consider whether CashCall violated the CFPA or what remedy would be appropriate for any violation, we must address a more fundamental issue. CashCall argues that the Bureau lacked authority to bring this action because the Bureau is unconstitutionally structured. By statute, the Bureau is headed by a single Director, who is appointed by the President with the advice and consent of the Senate, and who serves a five-year term during which the President may remove him only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(b)–(c). In *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020), the Supreme Court held "that the [Bureau's] leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers."

Anticipating that decision, CashCall argued in the district court and in its brief to us that the Bureau was unconstitutionally structured. By the time we first heard oral argument, this circuit had considered and rejected that theory in *CFPB v. Seila Law LLC*, 923 F.3d 680 (9th Cir. 2019), *vacated*, 140 S. Ct. 2183 (2020). But shortly after we heard oral argument, the Supreme Court granted certiorari in *Seila Law*, so we withdrew submission pending the Court's decision.

*Seila Law* involved a challenge to a civil investigative demand issued by the Bureau. 140 S. Ct. at 2194. After determining that the restrictions on the removal of the Director were unconstitutional, the Supreme Court severed the removal provision and remanded the case to this court to

determine whether the demand had been validly ratified "by an Acting Director accountable to the President" and to determine whether any such ratification would be "legally sufficient to cure the constitutional defect in the original demand." *Id.* at 2208 (plurality opinion); *id.* at 2224 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part).

Following the Supreme Court's decision, then-Director Kathleen Kraninger expressly ratified the civil investigative demand. *CFPB v. Seila Law LLC*, 997 F.3d 837, 846 (9th Cir. 2021). On remand, this court concluded that because "[a] Director well aware that she may be removed by the President at will [had] ratified her predecessors' earlier decisions," any constitutional injury that Seila Law suffered had been remedied. *Id.*

Here, as in *Seila Law*, Director Kraninger issued a statement formally ratifying the Bureau's "decisions to file the original and amended complaints against Defendants, and to file the notice of appeal to the U.S. Court of Appeals for the Ninth Circuit." We called for supplemental briefing on the effectiveness of the ratification, and we set this case for reargument. The Bureau argues that, just as in *Seila Law*, the ratifications were effective and cured the constitutional violation. But CashCall argues that Director Kraninger's ratification of the appeal was ineffective because it came after the deadline for filing a notice of appeal had expired. *See* 28 U.S.C. § 2107; *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994). Similarly, CashCall argues that her ratification of the action was ineffective because it came after the statute of limitations had expired. *See* 12 U.S.C. § 5564(g)(1).

We find it unnecessary to consider ratification because a more recent decision of the Supreme Court has made clear

that despite the unconstitutional limitation on the President's authority to remove the Bureau's Director, the Director's actions were valid when they were taken. In *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the Court considered a statutory restriction on the President's authority to remove the Director of the Federal Housing Finance Agency. The restriction paralleled that applicable to the Bureau's Director, and the Court held that it was unconstitutional based on "[a] straightforward application of our reasoning in *Seila Law*." *Id.* at 1784. But the Court went on to hold that the unconstitutionality of the removal restriction did *not* invalidate any actions taken by the Director: "All the officers who headed the [agency] during the time in question were properly appointed," and even though "the statute unconstitutionally limited the President's authority to remove the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office." *Id.* at 1787 (emphasis omitted). The Court explained that *Seila Law*'s holding does not mean that actions taken by an officer unconstitutionally insulated from removal "are void *ab initio* and must be undone." *Id.* at 1788 n.24. It saw "no basis for concluding that any head of the [agency] lacked the authority to carry out the functions of the office." *Id.* at 1788.

The same is true here. CashCall does not dispute that both the complaint and the notice of appeal were filed while the Bureau was headed by a lawfully appointed Director, Richard Cordray. *See CFPB v. Gordon*, 819 F.3d 1179, 1185, 1190–91 (9th Cir. 2016). As in *Collins*, "the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n.23.

That is not to say that the unlawfulness of a removal provision can never be a reason to regard an agency's action as void. *See Collins*, 141 S. Ct. at 1788. But at a minimum, the "party challenging an agency's past actions must . . . show how the unconstitutional removal provision *actually harmed* the party." *Kaufmann v. Kijakazi*, No. 21-35344, 2022 WL 1233238, at *5 (9th Cir. Apr. 27, 2022); *see also Collins*, 141 S. Ct. at 1788–89. For example, a party might demonstrate harm by showing that the challenged action was taken by a Director whom the President wished to remove but could not because of the statute. *Kaufmann*, 2022 WL 1233238, at *5. No one suggests that anything of the sort happened here. Under *Collins*, "there is no reason to regard any of the actions taken by the [Bureau] in relation to the [enforcement action] as void." 141 S. Ct. at 1787.

Here, because Director Cordray exercised power that he lawfully possessed, "there is no basis for concluding that [he] lacked the authority to carry out the functions of [his] office." *Collins*, 141 S. Ct. at 1788. With or without Director Kraninger's ratification, this action was validly initiated, and the notice of appeal was validly filed.

Finally, offering a new theory months after oral argument—and more than eight years after this litigation first began—CashCall asks us to hold that the Bureau's structure violates the Appropriations Clause of the Constitution. *See CFPB v. All Am. Check Cashing, Inc.*, No. 18-60302, 2022 WL 1302488, at *2 (5th Cir. May 2, 2022) (Jones, J., concurring). CashCall forfeited that argument twice over by failing to present it to the district court or in its briefing before us on appeal. *See Hawkins v. Kroger Co.*, 906 F.3d 763 (9th Cir. 2018). CashCall suggests that the argument somehow affects our subject-matter jurisdiction, but that erroneously conflates "the [Bureau's] authority to

execute the laws (Article II) with the United States' interest in the case (Article III)." *Gordon*, 819 F.3d at 1189. Because CashCall elected to wait until long after oral argument to raise this theory, we decline to consider it.

## III

The district court found that CashCall had engaged in a deceptive practice by collecting payments on loans that were invalid under state law. CashCall challenges that conclusion in two ways. First, it argues that the loans were valid because they were subject to tribal law, not state law. Second, it argues that CFPA liability for a deceptive practice cannot be predicated on a violation of state law. Because the district court resolved the issue of liability on summary judgment, we review de novo. *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 854 (9th Cir. 2019). We find neither of CashCall's arguments persuasive.

## A

Although the loans were valid under the law of the Cheyenne River Sioux Tribe, CashCall does not dispute that they were invalid under the laws of the States in which the customers resided, whether because the interest rates were usurious or because neither CashCall nor Western Sky was licensed in those States. The validity of the loans thus depends on which law applies.

The district court determined that the choice-of-law question is governed by federal common law because the court's jurisdiction was based on a federal question. CashCall does not challenge that holding on appeal, nor does it suggest that the application of state or tribal choice-of-law rules would change the result. In the absence of any specific guidance in the CFPA, we apply federal common law. *See*

*Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (explaining that when federal jurisdiction is not based on diversity of citizenship, "federal common law choice-of-law rules apply"); *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir. 1987). We have looked to "the approach outlined in the Restatement (Second) of Conflict of Laws" as a description of the federal common law rule. *Huynh*, 465 F.3d at 997.

All of the loan agreements contained a choice-of-law provision specifying the law of the Cheyenne River Sioux Tribe. When parties contract for the application of a particular jurisdiction's law, their choice normally controls. Restatement (Second) of Conflict of Laws § 187 (1971). But where the "issue is one which the parties could not have resolved by an explicit provision in their agreement," including, as here, because of substantive limits on their ability to contract, federal common law recognizes two circumstances in which the parties' choice does not control: (1) if "the chosen [jurisdiction] has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (2) if "application of the law of the chosen [jurisdiction] would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen [jurisdiction]" and which "would be the state of the applicable law in the absence of an effective choice of law by the parties." *Flores v. American Seafoods Co.*, 335 F.3d 904, 917 (9th Cir. 2003) (quoting Restatement (Second) of Conflict of Laws § 187(2)). The district court determined that both exceptions were satisfied. We agree with the district court that the first exception is satisfied, so we do not consider whether applying tribal law would be contrary to fundamental state policies.

The district court correctly determined that the Cheyenne River Sioux Tribe "has no substantial relationship to the parties" to the loans. Restatement (Second) of Conflict of Laws § 187(2)(a); *see Industrial Indem. Ins. Co. v. United States*, 757 F.2d 982, 987–88 (9th Cir. 1985). To be sure, Western Sky was nominally a party to the loans, and a jurisdiction ordinarily has a substantial relationship to a transaction if one of the parties has its principal place of business there, as Western Sky did. Restatement (Second) of Conflict of Laws § 187 cmt. f; *see PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007); *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1323 (9th Cir. 2012). But assessing whether a jurisdiction has a "substantial relationship" to a transaction requires looking at the substance of the transaction, not merely its form. *Cf. Abramski v. United States*, 573 U.S. 169, 184–85 (2014). After all, the reason the parties' choice of law is not always controlling is that there are some issues "which the parties could not have resolved by an explicit provision." Restatement (Second) of Conflict of Laws § 187(2). Parties cannot circumvent substantive limits on their ability to contract simply by applying the law of a jurisdiction that does not have those limits. *Id.* cmt. d ("Permitting the parties in the usual case to choose the applicable law is not, of course, tantamount to giving them complete freedom to contract as they will."). Similarly, parties cannot circumvent limits on their ability to specify the governing law simply by structuring their agreement so that it has some nominal—but entirely artificial—relationship to the desired jurisdiction. *Cf. Industrial Indem. Ins. Co.*, 757 F.2d at 987–88. We therefore follow the "standard practice, evident in many legal spheres . . . , of ignoring artifice when identifying the parties to a transaction." *Abramski*, 573 U.S. at 184–85.

In substance, all of the loan transactions at issue here were conducted by CashCall, not Western Sky. As the district court observed, "the entire monetary burden and risk of the loan program was placed on CashCall." Western Sky was formed for the purpose of making loans for CashCall, and it amounted to little more than a shell for CashCall's operations. Through a subsidiary, CashCall provided the money with which Western Sky made loans. CashCall agreed to purchase the loans that Western Sky made, and it did in fact purchase all of Western Sky's loans, just a few days after they were made and before the borrowers had made any payments. From then on, it bore all economic risk and benefits of the transactions. It also agreed to indemnify Western Sky for any legal or regulatory expenses. And even in the act of originating the loans, Western Sky's involvement was limited: At least at the beginning of the program, CashCall hosted Western Sky's website and phone number, and CashCall employees handled communications with customers. In sum, Western Sky's involvement in the transactions was economically nonexistent and had no purpose other than to create the appearance that the transactions had a relationship to the Tribe.

Nor is there any other basis for finding a relationship between the Tribe and the transactions. Western Sky was organized under South Dakota law, not tribal law, and it was neither owned nor operated by the Tribe. And the borrowers applied online or over the phone, never set foot on tribal land, and made payments from their home States, not the reservation. The only reason for the parties' choice of tribal law was to further CashCall's scheme to avoid state usury and licensing laws.

Because the Tribe had no substantial relationship to the transactions, and because there is no other reasonable basis

for the parties' choice of tribal law, the district court correctly declined to give effect to the choice-of-law provision in the loan agreements. Instead, the court applied the law of the jurisdiction with "the most significant relationship to the transaction and the parties," which it found to be the borrowers' home States. Restatement (Second) of Conflict of Laws § 188(1)–(2). And for the States at issue in this case, application of state law means that the loans were invalid.

CashCall does not dispute the district court's determination that the borrowers' home States had the most significant relationship to the transactions. Instead, it invokes the rule that if a loan is valid when made, it does not become usurious upon transfer to an assignee in a different jurisdiction. *See Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 109 (1833). But these loans were *not* valid when made because there was never any basis for applying the law of the Tribe in the first place, and they were invalid under the applicable laws of the borrower's home States. CashCall also objects that the district court phrased its conclusion in terms of a determination that CashCall was the "true lender," a concept that CashCall says "would disrupt lending markets and undermine the secondary loan market." To the extent that CashCall invokes cases involving banks, we note that banks present different considerations because federal law preempts certain state restrictions on the interest rates charged by banks. *See*, *e.g.*, 12 U.S.C. § 1831d (permitting state-chartered banks to charge the interest rate allowed in their home State). We do not consider how the result here might differ if Western Sky had been a bank. And we need not employ the concept of a "true lender," let alone set out a general test for identifying a "true lender." To answer the choice-of-law question, it suffices to examine the economic reality of these loans. As we have explained, doing so reveals

that the Tribe had no substantial relationship to the transactions.

## B

CashCall does not dispute that if the loans were governed by state law, they were void because (depending on the State) the interest rates were usurious or CashCall and Western Sky lacked required licenses. Nor does it dispute that it demanded payment from consumers under the pretense that the consumers had a valid obligation to pay. Instead, it argues that a finding of a deceptive practice under the CFPA is impermissible when the deception involves state law.

CashCall's argument finds no support in the text of the CFPA. The statute grants the Bureau broad authority to "enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). It makes it unlawful for a covered person to "to engage in any unfair, deceptive, or abusive act or practice." *Id.* § 5536(a)(1)(B). The statute does not define "unfair," "deceptive," or "abusive," so we give those terms their ordinary meaning. *Wall v. Kholi*, 562 U.S. 545, 551 (2011). A "deceptive" practice is one "tending to deceive," that is, "to cause to believe the false"—a meaning that easily encompasses leading a consumer to believe that an invalid debt is actually a legally enforceable obligation. *Webster's Third New International Dictionary* 584–85 (2002) (defining "deceive" and "deceptive").

In this case, of course, the reason that the debts were invalid happens to involve state law. But we see no reason

why that should make the statute inapplicable. In this respect, the CFPA is similar to the Fair Debt Collection Practices Act (FDCPA), which prohibits using "unfair or unconscionable means . . . to collect any debt." 15 U.S.C. § 1692f. In accord with the uniform view of other courts of appeals, we have held that a debt collector violates the FDCPA when it attempts to collect a debt that state law has made invalid. *See Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1133–34 (9th Cir. 2021); *see also Madden v. Midland Funding, LLC*, 786 F.3d 246, 254 (2d Cir. 2015); *Currier v. First Resol. Inv. Corp.*, 762 F.3d 529, 534–35 (6th Cir. 2014); *Johnson v. Riddle*, 305 F.3d 1107, 1121 (10th Cir. 2002). Likewise, other circuits have held that a debt collector violates the FDCPA's prohibition on threatening "to take any action that cannot legally be taken," 15 U.S.C. § 1692e(5), by threatening an action that is prohibited under state law. *See, e.g., LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (per curiam); *Picht v. Jon R. Hawks, Ltd.*, 236 F.3d 446, 451 (8th Cir. 2001).

The Sixth Circuit's analysis in *Currier* is particularly instructive. There, the plaintiff alleged that a debt collector had violated the FDCPA by filing a lien against her home when the lien was invalid under state law. 762 F.3d at 532. The debt collector argued that "a violation of state law is not a per se violation of the FDCPA." *Id.* at 536. The court agreed with that proposition but explained that it "does not mean that a violation of state law can never *also* be a violation of the FDCPA." *Id.* at 537. "The proper question . . . is whether the plaintiff alleged an action that falls within the broad range of conduct prohibited by" federal law, and in answering that question, "[t]he legality of the action taken under state law may be relevant." *Id.*

CashCall asserts that the FDCPA is different from the CFPA. Citing provisions of the FDCPA that refer to the "legal status" of a loan and to collection activities that are "permitted by law," 15 U.S.C. §§ 1692e(2)(A), 1692f(1), CashCall says that that statute, unlike the CFPA, "explicitly incorporates state law." The claim is puzzling. To *explicitly* incorporate state law, Congress would need, at a minimum, to explicitly reference state law, which the cited provisions in the FDCPA do not do. Instead, courts have read the general language of those statutory provisions to refer to state law by accounting for the background principle that, in our federal system, state law defines property and contractual rights. *See Richards v. PAR, Inc.*, 954 F.3d 965, 969–70 (7th Cir. 2020). That principle is equally applicable to the provision of the CPFA at issue here.

CashCall points to other provisions of the CFPA that mention state law, and it argues that they suggest, by negative implication, that a deceptive-practice claim cannot be based on a deception about state law. We find no such implication in the statute, which creates a co-regulatory regime between the States and the federal government. It directs the Bureau to cooperate with state regulators, and vice-versa. *See* 12 U.S.C. §§ 5495; 5552(b)(1)(A). Its preemption clause does not modify or limit state law, except to that extent that state law is inconsistent with the CFPA. *Id.* § 5551(a)(1). Nothing in those provisions suggests that deceptions involving state law are somehow exempt from the prohibition on deceptive practices.

And although the CFPA prohibits establishment of a federal usury rate, 12 U.S.C. § 5517(o), the Bureau has not established a federal usury limit here. Each state's usury and licensing laws still apply, and lenders must fairly and transparently represent to consumers the requirements of

applicable state law. *See id.* § 5511(a). That is not federalizing state usury law, as CashCall would have it; it is simply applying the CFPA's prohibition on deceptive acts.

CashCall argues that applying the CFPA here would raise constitutional concerns because it would "federalize an area of state regulation." In the cases on which CashCall relies, the Supreme Court applied a presumption that Congress does not lightly interfere with State authority over "punishment of local criminal activity." *Bond v. United States*, 572 U.S. 844, 858 (2014); *see also Cleveland v. United States*, 531 U.S. 12, 25 (2000); *Jones v. United States*, 529 U.S. 848, 858 (2000). But the CFPA is not a criminal statute. More importantly, CashCall's conduct was hardly "local"—it was a multi-jurisdictional lending scheme. That interstate commercial conduct is at the heart of Congress's regulatory authority under the Commerce Clause, and applying the CFPA to cover it raises no substantial constitutional questions. *See United States v. Lopez*, 514 U.S. 549, 558 (1995).

CashCall worries that the Board will convert a "dizzying array" of state-law violations into CFPA violations, offering examples of state laws requiring "that contracts be bilingual, in 12-point font, or notarized." But we have already held that a CFPA violation requires that a "representation, omission, or practice" be not only "likely to mislead consumers acting reasonably under the circumstances" but also "material." *Gordon*, 819 F.3d at 1192–93 & n.7 (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)); *Currier*, 762 F.3d at 534 (emphasizing that the conduct at issue "was not a mere technical violation of Kentucky law"). CashCall's examples would not necessarily qualify, but CashCall's actual conduct clearly does. CashCall led borrowers to believe that they had an obligation to pay, when in fact under

their States' laws they did not. That is the deceptive act pursued by the Bureau, and it falls within the prohibition of the statute.

## IV

We next consider the Bureau's argument that the district court should have imposed a tier-two civil penalty, which requires a finding that CashCall acted recklessly, rather than a tier-one penalty, which does not. The district court's assessment of whether a party acted recklessly is a factual finding that we review for clear error. *United States v. Luna*, 21 F.3d 874, 884 (9th Cir. 1994).

In general, "[a] person acts recklessly . . . when he consciously disregards a substantial and unjustifiable risk attached to his conduct, in gross deviation from accepted standards." *Borden v. United States*, 141 S. Ct. 1817, 1824 (2021) (quotation marks and citations omitted). We have described reckless conduct "as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger . . . that is either known to the [actor] or is so obvious that the actor must have been aware of it." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000) (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc)).

The district court determined that CashCall did not act recklessly because it "sought out highly regarded regulatory counsel to assist [it] with structuring the Western Sky Loan Program"; counsel opined that the program was lawful; and "there was no case law that clearly established that the Tribal Lending Model was not a lawful model." Although that conclusion is debatable, we conclude that it is not clearly erroneous—but only as it applies to the early stages of

CashCall's scheme. From September 2013, CashCall's conduct was reckless.

From the beginning, CashCall understood that to expand outside of California and make a profit, it would need to avoid state licensing and usury laws. To that end, it sought to work with state-chartered banks. But that approach received significant regulatory scrutiny from authorities in West Virginia and Maryland, leading to enforcement actions and large civil judgments. CashCall then pursued a tribal lending program that was nearly identical in structure to CashCall's state-chartered banking program that had already landed it in legal trouble. And over time, CashCall faced escalating regulatory scrutiny of the tribal program. In January 2011, Colorado sued Western Sky; in February, Maryland brought an administrative action against Western Sky; and in August, Washington brought an enforcement action against CashCall based on its servicing of Western Sky loans. Of the 13 States at issue here, seven ultimately brought enforcement actions against CashCall. In September 2013, CashCall stopped buying loans from Western Sky, which then shut down.

None of this should have been a surprise: Counsel had told CashCall that its plan faced "significant" risk, and one expert advised that the plan "should work but likely won't" because the "lower courts will shun our model and . . . if we reach the Supreme Court, . . . we will lose." Nevertheless, the district court was correct that CashCall had "secured multiple formal and informal opinions" from legal counsel stating "that the structure of the Western Sky Loan Program was viable." Given the uncertainty reflected in counsel's advice, the district court might have concluded that CashCall's conduct was reckless even at that point. But clear error is a deferential standard, and we are unable to say that

the district court's contrary determination was clearly erroneous. *See In re United States Dep't of Educ.*, 25 F.4th 692, 698 (9th Cir. 2022).

By September 2013, however, things had changed. In August, counsel recommended that the program cease because "the regulatory and litigation environments have risen from dangerous to near extinction." That opinion prompted CashCall to shut down the program and stop buying new loans. But despite the intense regulatory scrutiny, and despite shuttering the tribal lending program for new loans, CashCall continued to collect on existing loans. CashCall modified loans in States in which it had already reached settlements with regulators. But otherwise, even after this litigation began, CashCall continued collecting fees and interest until it lost at summary judgment in August 2016.

We conclude that from September 2013 on, the danger that CashCall's conduct violated the statute was "so obvious that [CashCall] must have been aware of it." *Howard*, 228 F.3d at 1063 (quoting *Hollinger*, 914 F.2d at 1569). The district court's contrary conclusion was clearly erroneous. We therefore vacate the civil penalty and remand with instructions that the district court reassess it, with the penalty for the period beginning in September 2013 being based on tier two.

V

Reddam argues that the district court erred in finding him personally liable. We have held that an individual is liable for a corporation's violation of the CFPA if "(1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or

falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." *Gordon*, 819 F.3d at 1193 (quoting *FTC v. Stefanchick*, 559 F.3d 924, 931 (9th Cir. 2009)). Reddam does not dispute that the first component of that test was satisfied because, as CEO, he had authority to control CashCall's acts. Thus, Reddam's liability turns on whether he had the requisite knowledge or acted recklessly.

Reddam argues that he lacked the necessary mental state because he relied on the advice of counsel. But as the district court correctly observed, we have held that "reliance on advice of counsel [is] not a valid defense on the question of knowledge required for individual liability." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014) (quotation marks and citation omitted) (alteration in original). In any event, even taking account of counsel's preliminary advice, continuing to collect loans after September 2013 was reckless for the reasons we have already explained. The district court did not err in holding Reddam personally liable.

## VI

The Bureau argues that the district court erred in denying restitution. We review the district court's order on restitution for abuse of discretion, *Gordon*, 819 F.3d at 1187, and a district court necessarily abuses its discretion if it makes an error of law, *Koon v. United States*, 518 U.S. 81, 100 (1996). We agree with the Bureau that the district court's decision rested on a legal error, so we vacate the order denying restitution and remand for further proceedings. We emphasize at the outset that we do not hold that restitution is necessarily appropriate in this case, or if so, in what amount, but leave those questions to be resolved by the district court.

The CFPA permits the Bureau to seek "any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law," which "may include, without limitation . . . restitution; [and] disgorgement or compensation for unjust enrichment." 12 U.S.C. § 5565(a)(1), (2)(C), (2)(D). Restitution may be either legal or equitable. "'[R]estitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case,' and whether it is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (second and third alterations in original) (quoting *Reich v. Continental Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994)). Thus, restitution is legal when the plaintiff cannot "assert title or right to possession of particular property" but is nevertheless "able to show just grounds for recovering money to pay for some benefit the defendant had received from him." *Id.* (citation omitted). "In contrast," restitution is equitable "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.*

The Bureau argues that while equitable restitution may be discretionary, the district court lacked discretion to deny legal restitution. *See Curtis v. Loether*, 415 U.S. 189, 197 (1974). CashCall responds that the Bureau waived this theory by arguing below that restitution was discretionary. CashCall also relies on the Supreme Court's recent decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), which CashCall says limited the scope of equitable restitution by establishing "that equitable remedies—whether labeled disgorgement, restitution, accounting, or otherwise—must be limited to a

wrongdoer's 'net profits,'" not the larger award sought by the Bureau.

We do not decide whether the Bureau has waived a claim to legal restitution or how, if at all, *Liu* might limit equitable restitution. The district court may consider those issues on remand; we confine ourselves to the issues it has already addressed. The district court relied on its conclusion that the Bureau did not show that CashCall "intended to defraud consumers or that consumers did not receive the benefit of their bargain." First, noting that CashCall had relied on the advice of counsel, it saw "no evidence that [CashCall] decided to embark on an unlawful scheme to structure the Western Sky Loan Program to defraud borrowers." Second, it found that "consumers received the benefit of their bargain—i.e., the loan proceeds." Neither of those considerations was an appropriate basis for denying restitution.

First, while a district court may award restitution when "appropriate," 12 U.S.C. § 5565(a)(1), its decision must be made consistent with the statute. *See Pantron I*, 33 F.3d at 1103; *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975) (holding that a court deciding whether to award backpay under Title VII "must exercise this power in light of the large objectives of the Act" (quotation marks and citation omitted)). One of the statute's express objectives is to ensure that "consumers are protected from unfair, deceptive, or abusive acts and practices." 12 U.S.C. § 5511(b)(2). Another is to promote transparency in the markets for consumer financial products and services. *Id.* § 5511(b)(5). The statute authorizes the Bureau to initiate civil litigation and seek remedies to achieve those objectives. *See id.* §§ 5531, 5564(a). Restitution is one of those remedies, and it serves to ensure that consumers are made

whole when they have suffered a violation of the statute. *See id.* § 5565(a)(2).

Significantly, although scienter is required for an award of heightened civil penalties under the CFPA, 12 U.S.C. § 5565(c)(2)(B)–(C), it is not required for an award of restitution. *Id.* § 5565(a)(2). In giving dispositive weight to CashCall's lack of bad faith, the district court employed an approach that would make the restitutionary remedy "punishment for moral turpitude, rather than a compensation" for consumers' injuries. *See Albermarle Paper*, 422 U.S. at 422. That approach would frustrate Congress's objective of compensating consumers who suffered harm on account of CashCall's deceptive practices.

Second, whether consumers received the benefit of their bargain is not relevant. The Bureau did not allege that the consumers were denied the loan proceeds or that they entered into the loan agreements against their will. Rather, the Bureau alleged that CashCall harmed consumers by deceiving them about a major premise underlying their bargain: that the loan agreements were legally enforceable. The district court misunderstood the nature of CashCall's deceptive practice when it treated consumers' receipt of the benefits of that bargain as a reason to deny restitution.

The district court also determined that the Bureau did not establish the amount of restitution that would be appropriate. Specifically, the court stated that the "proposed restitution amount [should be] netted to account for expenses." That statement is inconsistent with our precedent, which establishes a two-step burden-shifting framework for calculating restitution. *See Gordon*, 819 F.3d at 1195. At step one, the Bureau "bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." *Id.* (citation omitted). If the

Bureau makes that threshold showing, then "the burden shifts to the defendant to demonstrate that the net revenues figure overstates the defendant's unjust gains." *Id.*

Applying that framework, we have held that "[r]estitution may be measured by the 'full amount lost by consumers rather than limiting damages to a defendant's profits.'" *Gordon*, 819 F.3d at 1195 (quoting *Stefanchik*, 559 F.3d at 931). In other words, "[a] district court may use a defendant's net revenues as a basis for measuring unjust gains." *Id.* Net revenues are "typically the amount consumers paid for the product or service minus refunds and chargebacks." *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 603 (9th Cir. 2016), *abrogated on other grounds by AMG Cap. Mgt., LLC v. FTC*, 141 S. Ct. 1341 (2021). An award of net revenues differs from an award of net profits, which allows a defendant to "deduct legitimate expenses." *Liu*, 140 S. Ct. at 1950. We have held that "there are instances in which a defendant does not ultimately reap any profits from his wrongful conduct, and others where even though the defendant obtained some profit, the 'loss suffered by the victim is greater than the unjust benefit received by the defendant.'" *CFTC v. Crombie*, 914 F.3d 1208, 1216 (9th Cir. 2019) (quoting *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993) (per curiam)); *see also Stefanchik*, 559 F.3d at 931.

Perhaps net revenues would overstate CashCall's unjust gains, but if so, that was CashCall's burden to prove. On remand, if the district court determines that an award of restitution is appropriate, it should take these principles into account in calculating the award.

**AFFIRMED in part, VACATED in part, and REMANDED**.